JANE L., on behalf of herself and all others similarly situated; Utah Women's Clinic, P.C.; Planned Parenthood Association of Utah; David Hansen, M.D.; Madhuri Shah, M.D.; John Carey, M.D.; Dan Chichester, M.D.; Kirtly Parker Jones, M.D.; Kathleen Kennedy, M.D.; Neil K. Kochenour, M.D.; Rhonda Lehr, M.D.; Claire Leonard, M.D.; Kenneth Ward, M.D.; Bonnie Jeanne Baty, M.D.; Susan Elizabeth Lyons, L.C.S.W.; Janet Lynn Wolf, L.C.S.W.; Leslie McDonald–White, L.C.S.W.; Reverend David Butler; Reverend Barbara Hamilton–Holway; Reverend George H. Lower; Reverend Lyle D. Sellards; Reverend Doctor Alan Condie Tull; Reverend Marie Soward Green; Rabbi Frederick L. Wenger; Jane J. Freedom, (Pseudo–Name); Julie Spouse, (Pseudo–Name); American College of Obstetricians and Gynecologists, Utah Sections; Penny Thompson; Wendy Edwards, Plaintiffs–Appellants,

v.

Norman H. BANGERTER, as Governor of the State of Utah; Paul Van Dam, Attorney General, as Attorney General of Utah, Defendants–Appellees.

Nos. 93–4044, 93–4059.

United States Court of Appeals, Tenth Circuit.

Aug. 2, 1995.

Simon Heller (Janet Benshoof and Rachael Pine, of The Center for Reproductive Law & Policy, New York City; and Jeffrey R. Oritt, of Cohne, Rappaport & Segal, P.C., Salt Lake City, UT; and A. Howard Lundgren, of Bugden & Lundgren, Salt Lake City, UT, with him on the briefs), of The Center for Reproductive Law & Policy, New York City, for plaintiffs-appellants.

Jerrold S. Jensen, Asst. Atty. Gen. (Jan Graham, Utah Atty. Gen. and Brent A. Burnett, Asst. Atty. Gen., with him on the brief), Salt Lake City, UT, for defendants-appellees.

Before SEYMOUR, Chief Judge, MOORE, Circuit Judge, and BROWN, Senior District Judge.[*]

---

* Honorable Wesley E. Brown, Senior United States District Judge, District of Kansas, sitting by designation.

1. We note in passing that we asked the parties to brief a jurisdictional issue at a preliminary stage

SEYMOUR, Chief Judge.

In the instant case, we are called upon to determine the legal vitality of several provisions of Utah's 1991 abortion law against the backdrop of *Planned Parenthood of Southeastern Pennsylvania v. Casey,* — U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). On January 25, 1991, Utah's governor signed "An Act Relating to Abortion; Prohibiting Abortion Except Under Specified Circumstances." This legislation, which prohibited all abortions except in five enumerated situations, patently violated *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Recognizing that their legislation was a facial attack on prevailing Supreme Court abortion jurisprudence, the Utah legislature simultaneously set aside funds in an "Abortion Litigation Trust Account." Utah Code Ann. § 76–7–317.1. Meanwhile, the Supreme Court reconfronted abortion jurisprudence in *Casey,* which involved a similarly restrictive Pennsylvania abortion law. Although *Casey* realigned the law, it reaffirmed the central tenet of *Roe v. Wade* that state regulation of abortion impinges on a woman's right to privacy. Utah's attempt to play a significant role in toppling *Roe v. Wade* did not succeed, and we now assess the constitutionality of the remnants of Utah's pre-*Casey* legislation.[1]

I.

In April 1991, plaintiffs filed a complaint challenging the newly amended Utah Abortion Act, Utah Code Ann. §§ 76–7–301 *et seq.* In an eight-count amended complaint filed shortly thereafter, plaintiffs alleged several federal and state constitutional violations. Following a period of discovery, defendants filed a Motion to Dismiss and a Motion for Partial Summary Judgment, and the district court orally entered orders vacating trial and granting the motions as to certain causes of action. In *Jane L. v. Bangerter,* 794 F.Supp. 1528 (D.Utah 1992) (*Jane L. I*), the district court denied plaintiffs' motion to voluntarily

of the appellate proceedings. We are satisfied that any jurisdictional problems have been corrected and that appellate jurisdiction is present. The parties do not argue to the contrary.

dismiss claims arising under Utah's constitution without prejudice and instead dismissed the state constitutional claims with prejudice. In *Jane L. v. Bangerter*, 794 F.Supp. 1537 (D.Utah 1992) (*Jane L. II* ), the district court granted defendants' motions with regard to the following claims: vagueness, equal protection, Establishment Clause, Free Exercise Clause, involuntary servitude, freedom of speech, and fetal experimentation (vagueness and privacy). The court kept the remaining claims under advisement pending the Supreme Court's decision in *Casey*, —— U.S. ——, 112 S.Ct. 2791.

*Casey* was argued April 22, 1992, one month before the district court issued *Jane L. I* and *Jane L. II.* The Supreme Court decided *Casey* on June 29, 1992. The district court decided the remaining issues in this case on December 17, 1992. *Jane L. v. Bangerter*, 809 F.Supp. 865 (D.Utah 1992) (*Jane L. III* ). The court held that in light of *Casey* the pre–20 week restrictions on abortions in Utah Code Ann. § 76–7–302(2), as well as the spousal notification provision in Utah Code Ann. § 76–7–304(2), were unconstitutional. The court upheld the choice of method provisions in Utah Code Ann. §§ 76–7–307 and 308 and the serious medical emergency exception in Utah Code Ann. § 76–7–315. The district court also upheld the stringent limitations on the availability of post–20 week abortions. Utah Code Ann. § 76–7–

302(3). For the reasons set forth below, we affirm in part and reverse in part.

## II.

### SEVERABILITY

A. Section 302(3): Post–20 Week Abortion Ban

The district court's first task after *Casey* was to determine the constitutionality of section 302 of the Act.[2] The court held that section 302(2) was unconstitutional in light of the Supreme Court's decision in *Casey*. Section 302(2) banned all abortions in Utah except under five narrow circumstances: (a) to save the pregnant woman's life; (b) to terminate a pregnancy resulting from rape; (c) to terminate a pregnancy resulting from incest; (d) to prevent grave damage to the pregnant woman's medical health; and (e) to prevent the birth of a child that would be born with grave defects. Section 302(3) provided that abortions after 20 weeks gestational age could only be performed to save the mother's life, to prevent grave damage to the woman's health, and to prevent the birth of a child with grave defects. In other words, section 302(3) narrowed section 302(2) further after 20 weeks gestational age to eliminate the exception for rape or incest.

The district court held that section 302(3) was severable from section 302(2). The court further held that section 302(3) did not

---

2. Utah Code Ann. § 76–7–302. *Circumstances under which abortion authorized.*

(1) An abortion may be performed in this state only by a physician licensed to practice medicine under the Utah Medical Practice Act or an osteopathic physician licensed to practice medicine under the Utah Osteopathic Medicine Licensing Act and, if performed 90 days or more after the commencement of the pregnancy as defined by competent medical practices, it shall be performed in a hospital.

(2) An abortion may be performed in this state only under the following circumstances:

(a) in the professional judgment of the pregnant woman's attending physician, the abortion is necessary to save the pregnant woman's life;

(b) the pregnancy is the result of rape or rape of a child, as defined by Sections 76–5–402 and 76–5–402.1, that was reported to a law enforcement agency prior to the abortion;

(c) the pregnancy is the result of incest, as defined by Subsection 76–5–406(10) or Section

76–7–102, and the incident was reported to a law enforcement agency prior to the abortion;

(d) in the professional judgment of the pregnant woman's attending physician, to prevent grave damage to the pregnant woman's medical health; or

(e) in the professional judgment of the pregnant woman's attending physician, to prevent the birth of a child that would be born with grave defects.

(3) After 20 weeks gestational age, measured from the date of conception, an abortion may be performed only for those purposes and circumstances described in Subsections 2(a), (d), and (e).

(4) The name of a victim reported pursuant to Subsection (b) or (c) is confidential and may not be revealed by law enforcement or any other party except upon approval of the victim. This subsection does not effect or supersede parental notification requirements otherwise provided by law.

impose an undue burden on a woman's liberty interest and therefore was constitutional under *Casey.* Plaintiffs appeal both of these holdings. After a *de novo* review, *United States v. Johnson,* 941 F.2d 1102, 1111 (10th Cir.1991), we conclude that section 302(3) is not severable and therefore is invalid along with section 302(2).[3]

■ Severability is an issue of state law. *See Watson v. Buck,* 313 U.S. 387, 396, 61 S.Ct. 962, 966, 85 L.Ed. 1416 (1941). Under Utah law, legislative intent governs the severability inquiry. *See Stewart v. Utah Pub. Serv. Comm'n,* 885 P.2d 759, 779 (Utah 1994); *Utah Technology Fin. Corp. v. Wilkinson,* 723 P.2d 406, 414 (Utah 1986); *Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 686 (Utah 1985); *Salt Lake City v. International Ass'n of Firefighters,* 563 P.2d 786, 791 (Utah 1977) Legislative intent is determined first and foremost by answering the following question: Would the legislature have passed the statute without the unconstitutional section? *See Stewart,* 885 P.2d at 779 (" 'The test fundamentally is whether the legislature would have passed the statute without the objectionable part....' ") (quoting *Union Trust Co. v. Simmons,* 116 Utah 422, 211 P.2d 190, 193 (1949)); *Berry,* 717 P.2d at 686 (holding an act nonseverable because "[w]e cannot conclude that the legislature would have enacted [the remaining sections] without [the unconstitutional section].").

■ To determine whether the legislature would have passed a statute without its unconstitutional section, courts should examine the interdependence of the statutory provisions. *See Stewart,* 885 P.2d at 779 (where statutory provisions are "so dependent upon each other ... the court should conclude the intention was that the statute be effective only in its entirety" (quoting *Union Trust,* 211 P.2d at 193)); *International Ass'n of Firefighters,* 563 P.2d at 791 ("[W]here the provisions are interrelated, it is not within the scope of the court's function to select the valid portions and make conjecture the legis-

lature intended they should stand independent of the portions which are invalid.").

■ The substantive intent of the Utah legislature in passing section 302 was clearly to challenge the *Roe v. Wade* framework and to ban abortion throughout pregnancy, although with a few exceptions. *See Utah Women's Clinic, Inc. v. Leavitt,* 844 F.Supp. 1482, 1484–85 (D.Utah 1994). The legislature explicitly set forth this intent in the preamble: "It is the intent of the Legislature to protect and guarantee to unborn children their inherent and inalienable right to life...." Utah Code Ann. § 76–7–301.1(3). The resolution which served as the precursor to Utah's 1991 abortion act buttresses our reading of legislative intent.

> The policy and position of the Legislature is to favor childbirth over abortion, and [to regulate abortion] as permitted by the U.S. Constitution....
>
> [L]ives of human beings are to be recognized and protected regardless of their degree of biological development....
>
> Utah has a compelling state interest in the life of the unborn throughout pregnancy....
>
> [A]bortion is not a legitimate or appropriate method of birth control....
>
> [I]t is the policy of the Legislature that, if an abortion is granted, it should be only under very limited circumstances, including danger to the life or physical health of the mother, pregnancies resulting from rape or incest, and cases of severe deformity of the unborn child.

H.J.R.Res. 38, 48th Leg., 1990 Utah Laws 1554–55. The legislature clearly intended to prohibit all abortions, regardless of when they occur during the pregnancy, except in the few specified circumstances.

Sections 302(2) and 302(3) were the operative statutory sections designed to execute this intent. Together they operated as a unified expression of legislative intent to ban most abortions, from conception to birth.

---

3. Given our holding that section 302(3) is not severable and is therefore invalid, we need not address plaintiffs' argument that Utah's post–20 week criminal ban on abortions in section 302(3) is an imperfect proxy for viability and therefore

violates the Supreme Court's holding in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* ── U.S. ──, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

Section 302(2), the overarching abortion ban, prohibited abortions in all but the five described circumstances, and section 302(3) merely modified this ban, removing the rape and incest exceptions for abortions after 20 gestational weeks. With the nullification of the abortion ban in section 302(2), the statute was gutted, and section 302(3) was left purposeless without an abortion ban to modify. It is not our role to rewrite the general abortion ban by elevating section 302(3), which simply modified a now-defunct statute, to the general rule. We therefore hold that section 302(3) is not severable.

Defendants argue that the legislature intended for all provisions to be severable and that this intent should govern our disposition of the severability issue. They point to the severability clause in the 1991 abortion act, which reads as follows.

> If any one or more provision, section, subsection, sentence, clause, phrase or word of this part or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this part shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed this part, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

Utah Code Ann. § 76–7–317. Under Utah law, courts must ask whether the legislature would have passed the statute without the unconstitutional section when determining whether the legislature intended for certain provisions to be severable from others. Defendants argue that the second sentence of section 317, stating that the legislature would have passed each section independent of the unconstitutional part, demands that we sever section 302(3). We disagree.

We confront here potentially conflicting legislative intents. Substantively, severing 302(3) from 302(2) clearly undermines the legislative purpose to ban most abortions.

Structurally, severance seems to have been contemplated and approved by the legislature. Which takes precedence? We conclude that the substantive legislative intent predominates and precludes severability for two reasons.

■ First, Utah case law resolves conflicts among legislative intentions in favor of the legislature's overarching substantive intent. Under Utah law, courts can and should ignore severability (or savings) clauses if severance would undermine legislative intent. For example, in *Doe v. Rampton*, 366 F.Supp. 189 (D.Utah 1973), the district court entertained a post-*Roe* challenge to Utah's abortion statute. Even though the court did not hold all provisions of the statute unconstitutional, it ignored a severability clause and invalidated the entire statute.[4] *Id.* at 193–94. The district court stated: "Each and every challenged part of these statutes was intended to and does contribute" to the improper purpose of "making the obtaining or performing of an abortion in Utah extremely burdensome." *Id.* The court refused to "edit these statutes in order to alter the legislative purpose." *Id.* at 194.

■ The Utah Supreme Court similarly ignored a severability clause in *Salt Lake City v. International Ass'n of Firefighters*, 563 P.2d 786. In that case, the provisions of the Utah Firefighters' Negotiation Act (UFNA) governing arbitration were held violative of the Utah constitutional provision proscribing state legislative usurpation of municipal functions. The Utah Supreme Court held that the UFNA, a comprehensive statute designed to aid in the resolution of labor disputes, was "sequential in nature, commencing with negotiations concerning specific subject matter and culminating in arbitration of all unresolved issues." *Id.* at 791. Because the arbitration provisions were integral to fulfilling legislative intent and because the various provisions were sequentially interrelated, the Utah Supreme Court held that the unconstitutional arbitration provision was not severable, even in the face of a severability clause. *Id.; see also State v.*

---

4. Because severability is an issue of state law, the district court in *Doe v. Rampton* necessarily applied Utah law to determine severability. 366 F.Supp. 189 (D.Utah 1973).

*Salt Lake City,* 445 P.2d 691, 696 (Utah 1968) ("[E]ven where a savings clause existed, where the provisions of the statute are interrelated, it is not within the scope of this court's function to select the valid portion of the act and conjecture that they should stand independently of the portions which are invalid."); *Carter,* 399 P.2d at 441–42 (ignoring severability clause where remaining statutory sections are dependent upon the one declared unconstitutional). Utah law instructs that we subordinate severability clauses, which evince the legislature's intent regarding the structure of the statute, to the legislature's overarching substantive intentions. In the hierarchy of often conflicting legislative intentions, Utah law mandates that substantive intent take precedence.

Second, it is unclear whether our conclusion regarding the severability of section 302(3) actually conflicts with the Utah legislature's structural intentions. Section 317.2 reads as follows:

> If Section 76-7-302 as amended by Senate Bill 23, 1991 Annual General Session, is ever held to be unconstitutional by the United States Supreme Court, Section 76-7-302, as enacted by Chapter 33, Laws of Utah 1974, is reenacted and immediately effective.

Utah Code Ann. § 76-7-317.2. The inclusion of section 317.2 suggests that the legislature contemplated Supreme Court invalidation of the general abortion ban in section 302 and wanted to provide a clear road map to cover this contingency. We interpret section 317.2 as making an exception to the general severability clause specifically for section 302.

In sum, sections 302(2) and 302(3), together, effected the Utah legislature's purpose of banning abortions throughout pregnancy. Although the legislature included a severability clause, the Utah Supreme Court has repeatedly ignored such clauses in the name of legislative intent. We conclude that severing section 302(3) from section 302(2) would undermine legislative intent. Section 317.2, which provides a specific contingency for the scenario at hand, bolsters this conclusion. The district court held that section 302(2) is unconstitutional, and defendants do not appeal that holding. Section 302(3), as an inte-gral, unseverable post–20 week analog to section 302(2), must also be invalidated. We hold that section 302(3) is not severable from 302(2) and reverse the district court's contrary holding.

**B. Section 315: Serious Medical Emergency Exception**

■ Plaintiffs also argue that Utah Code Ann. § 76-7-315 is not severable from the sections of the abortion statute that the district court invalidated. Section 315 provides:

> When due to a serious medical emergency, time does not permit compliance with Section 76-7-302, Subsection 76-7-304(2) or Subsection 76-7-305(2), the provisions of those sections do not apply.

We have held that section 302(3) is invalid. The district court held that the pre–20 week abortion ban in section 302(2) and the spousal notification portion of section 304(2) were unconstitutional, and defendants do not appeal these holdings. We nonetheless conclude that the remainder of section 315 can stand without violating legislative intent. Section 315 provides medical professionals with greater flexibility and discretion when confronting a serious medical emergency. While the invalidation of sections 302(2), 302(3), and part of section 304(2) necessarily reduces the reach of section 315, the remainder of section 304(2) (parental notification) and section 305(2) (informed consent requirements) remain valid and continue to impose requirements that, in the face of a medical emergency, could be quite costly and cumbersome. It would therefore frustrate legislative intent if we concluded that section 315 was invalid in its entirety simply because we invalidated some of the provisions cited therein. We hold that section 315 is severable from the invalidated portions of the statute.

**III.**

**FETAL EXPERIMENTATION BAN**

Section 310 provides: "Live unborn children may not be used for experimentation, but when advisable, in the best medical judgment of the physician, may be tested for genetic defects." Utah Code Ann. § 76-7-

310. Any violation of this section, regardless of mental state, is a felony of the third degree. *See* Utah Code Ann. § 76–7–314(2). Plaintiffs argued below that this statute was unconstitutionally vague and impinged upon their constitutionally protected right to privacy. In rejecting these arguments, the district court concluded that the plain meaning of the statutory phrase "used for experimentation" is "to protect unborn children from tests or medical techniques which are designed solely to increase a researcher's knowledge and are not intended to provide any therapeutic benefit to the mother or child." *Jane L. II*, 794 F.Supp. at 1550. The court further concluded that "[a]s long as there is intent to benefit the fetus or the mother, the fetus is not being '*used* for experimentation.'" *Id.* Thus determining that the statute does not proscribe beneficial tests or therapies, the court summarily rejected the right to privacy claim. *Id.* at 1551.

■ Plaintiffs assert that the fetal experimentation statute should be deemed void for vagueness, contending that the district court's interpretation of the statute contradicts its plain meaning and legislative history and violates established rules of statutory interpretation. Plaintiffs also reassert their argument that the statute violates their constitutionally protected right to privacy. After a *de novo* review, *Horowitz v. Schneider Nat'l, Inc.*, 992 F.2d 279, 281 (10th Cir.1993), we hold that the statute is unconstitutionally vague.

Vague laws frustrate several principles that have been sturdy pillars of our legal system.

"First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judge, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications."

*Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972)). We therefore invalidate vague criminal statutes when they "fail to alert the average person of the prohibited conduct." *Brecheisen v. Mondragon*, 833 F.2d 238, 241 (10th Cir.1987), *cert. denied*, 485 U.S. 1011, 108 S.Ct. 1479, 99 L.Ed.2d 707 (1988).

■ We "indulge a presumption" of constitutionality when reviewing vagueness challenges to state statutes. *Id.* In a civil context, where the enactment does not implicate constitutional rights, a court should find a statute unconstitutionally vague only if "the enactment is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 494–95, 102 S.Ct. at 1191. Where a statute imposes a criminal penalty, we can invalidate it "even when it could conceivably have had some valid application." *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983) (quoting *Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191). In the instant case, anyone who violates section 310 is subject to third degree felony charges and penalties. *See* Utah Code Ann. § 76–7–314(2). Consequently, the less demanding *Kolender* standard governs this case.

■ Section 310 bans "experimentation" on "live unborn children." "Experimentation" is an ambiguous term that lacks a precise definition. What tests and procedures constitute experimentation? There are at least three possible answers: 1) those procedures that a particular doctor or hospital have not routinely conducted; 2) those procedures performed on one subject that are designed to benefit another subject; and 3) those procedures that facilitate pure research and do not necessarily benefit the subject of experimentation. *See Lifchez v. Hartigan*, 735 F.Supp. 1361, 1364–65, 1376 (N.D.Ill. 1990) (concluding the term "experimentation" was unconstitutionally vague and therefore invalidating similar fetal experimentation ban); *see also Margaret S. v. Edwards*, 794

F.2d 994, 998–99 (5th Cir.1986) (invalidating Louisiana fetal experimentation statute because "experimentation" was unconstitutionally vague). Testimony in the record highlights the ambiguities in the term "experimentation." For example, one doctor testified that "experimentation" can have two distinct meanings: 1) "[W]hen you do things to see—just wonder 'What would happen if I did this? What would happen if I gave a fetus this drug; what would be the outcome[?]' "; and 2) doing a procedure without a "data base of many cases to rely upon." Aplt.App. at 172. Because there are several competing and equally viable definitions, the term "experimentation" does not place health care providers on adequate notice of the legality of their conduct.

The Supreme Court recognizes "that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. at 1193; *see also Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685–86, 58 L.Ed.2d 596 (1979). While this statute has a clear scienter requirement for those who "perform an abortion," Utah Code Ann. § 76–7–314(1), it has no similar requirement for those who conduct fetal experimentation. In fact, the statute explicitly states that *any* violation of section 310 is a felony of the third degree. *Id.* at § 76–7–314(2) (emphasis added). We thus cannot salvage the ambiguities inherent in the term "experimentation" through resort to an additional scienter requirement.

Defendants argue that the district court cured the statute's ambiguity and vagueness by interpreting "used for experimentation" as prohibiting only those experiments that do not benefit either mother or fetus. We reject this argument for three reasons. First, the district court rewrote the statute. Second, the district court's interpretation contradicts the legislative history, thereby violating steadfast rules of statutory interpretation. Finally, even as interpreted by the district court, "used for experimentation" is unconstitutionally vague.

In an effort to cure the fatal ambiguity in the statute, the district court grafted its own meaning onto the statute's language. We do not understand how "used for experimentation" translates to "tests or medical techniques which are designed solely to increase a researcher's knowledge and are not intended to provide any therapeutic benefit to the mother or child." *Jane L. II,* 794 F.Supp. at 1550. The district court blatantly rewrote the statute, choosing among a host of competing definitions for "experimentation." This is an improper use of judicial power.

In rewriting the statute, the court also contradicted legislative intent. The Utah legislature enacted the fetal experimentation ban in its present form in 1974. The same legislature enacted two choice of method provisions, which were amended in 1991 and are now codified at Utah Code Ann. §§ 76–7–307 and 308.[5] In 1974, these provisions required doctors performing post-viability abortions to choose the abortion method that would give the unborn child the best chance of survival unless doing so would cause "serious and permanent damage" to the woman's health. Utah Code Ann. §§ 76–7–307 and 76–7–308 (amendment notes). It would be anomalous to require that a woman suffer serious health damage to benefit a fetus when pursuing an abortion but to permit a woman to undergo any beneficial, but experimental, treatment regardless of its effect on the fetus. In other words, the choice of method provisions enacted concurrently reveal the legislature's intent to protect the life of the fetus. Grafting an interpretation onto the fetal experimentation section that weighs benefits to the pregnant woman on a par with benefits to the fetus is patently inconsistent with legislative intent. By construing the fetal experimentation ban to include an exception for experimentation designed to benefit the pregnant woman, the district court improperly substituted its own judgment for that of the legislature.

■ The district court's interpretation also violated rules of statutory interpretation. "As a general principle of statutory interpretation, if a statute specifies exceptions to its general application, other exceptions not explicitly mentioned are excluded." *United*

5. *See* text of statutes infra at 22–23 n. 6.

*States v. Goldbaum,* 879 F.2d 811, 813 (10th Cir.1989); *see also Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980). Section 310 arguably contains an exception to the comprehensive ban to allow testing for genetic defects.[6] The district court's interpretation excludes from the general ban all procedures beneficial to the pregnant woman or fetus, thereby creating additional, unspecified exceptions and violating this canon of statutory construction. Moreover, a court's interpretation of a statute should not render any clauses superfluous. *See Bridger Coal Co. v. Office of Workers' Compensation Programs,* 927 F.2d 1150, 1153 (10th Cir.1991). As interpreted by the district court, the fetal experimentation ban would allow all diagnostic testing because the pregnant woman benefits from knowing more information about the welfare of her child. Genetic testing is a particular type of diagnostic testing. The genetic testing exception therefore becomes superfluous.

Finally, the district court interpreted "used for experimentation" to prohibit only those procedures that provide no benefit to mother or fetus. Although curing some of the imprecision in the term "experimentation," this construction is not free from ambiguity. What does "benefit" mean? If the mother gains knowledge from a procedure that would facilitate future pregnancies but inevitably terminate the current pregnancy, would the procedure be deemed beneficial to the mother? Does the procedure have to be beneficial to the particular mother and fetus that are its subject? In vitro fertilization exposes and fertilizes several ova to assure that one can be implanted in the mother. The other ova are destroyed. Would this common procedure be proscribed under the

statute because some ova are subjected to non-therapeutic experimentation, i.e., of no benefit to the ovum or the mother? Accordingly, we conclude that the district court's interpretation is itself unconstitutionally vague.

The criminal law must clearly demarcate criminal conduct from permitted action. Section 310 does not do that here. During the course of the proceedings, one doctor testified that he had developed a procedure to cure a fatal abnormality in a fetus. Not only was he unsure whether this treatment constituted experimentation for the purposes of the statute, but he was also reluctant to testify for fear that his actions "could theoretically be considered illegal under the Utah statute that was in effect" when he began the treatment. Aplt.App. at 182. Because of the vagaries of the statute, individuals like this doctor may avoid conduct that would not be proscribed in order to avert criminal liability to the detriment of beneficial research. By failing to draw a clear line between proscribed and permitted conduct, section 310 violates established legal principles that provide a crucial backdrop to our criminal legal system. We hold section 310 unconstitutionally vague and reverse the district court's decision with regard to this claim.

## IV.

## CHOICE OF METHOD PROVISIONS

Sections 307 and 308 require that a doctor perform a post-viability abortion in a manner that "will give the unborn child the best chance of survival" unless that method would cause "grave damage to the woman's medical health." Utah Code Ann. §§ 76–7–307 and 308.[7] Both plaintiffs and defendants charac-

---

6. Section 310 is a poorly drafted statute, and we recognize that the second clause is only arguably an exception. However plaintiffs, Aplt.Br. at 40–41, and defendants, Aplee.Br. at 45 n. 18, agree that this clause is an "exception." We therefore assume that the genetic testing clause constitutes an exception.

7. Utah Code Ann. § 76–7–307 provides:

   If an abortion is performed when the unborn child is sufficiently developed to have any reasonable possibility of survival outside its moth-

er's womb, the medical procedure used must be that which, in the best medical judgment of the physician will give the unborn child the best chance of survival. No medical procedure designed to kill or injure that unborn child may be used unless necessary, in the opinion of the woman's physician, to prevent grave damage to her medical health.
   Utah Code Ann. § 76–7–308 provides:
   Consistent with the purpose of saving the life of the woman or preventing grave damage to the woman's medical health, the physician performing the abortion must use all of his medi-

terize these two statutes as "choice of method" provisions given that they require a doctor to use the abortion method that would best assure the unborn child's chances of survival unless such a method would gravely damage a woman's medical health. The district court held that these two provisions were "facially valid" and bore "a rational relationship to the legitimate state interest in preservation of viable fetal life." *Jane L. III*, 809 F.Supp. at 875–76. Relying on *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), plaintiffs argue on appeal that these provisions violate a woman's right to privacy. We agree and reverse.

In *Thornburgh*, the Supreme Court invalidated a Pennsylvania choice of method statute.[8] The Court agreed with the Third Circuit that the statute was unconstitutional "because it required a 'trade-off' between the woman's health and fetal survival, and failed to require that maternal health be the physician's paramount consideration." *Thornburgh*, 476 U.S. at 768–69, 106 S.Ct. at 2183 (citing *Colautti*, 439 U.S. at 400, 99 S.Ct. at 688). The *Thornburgh* analysis thus guides our disposition of this case.

■ Sections 307 and 308 require that the doctor focus on the unborn child's chances of survival until the risk to the woman's health becomes grave. In demanding that the woman's health be in grave danger before prevailing under the choice of method requirements, sections 307 and 308 are significantly more burdensome than the statute in *Thornburgh*. In *Thornburgh*, the woman's health risks outweighed those of the unborn child if the particular "method or

technique would present a significantly greater medical risk to the life or health of the pregnant woman." *Id.* at 768 n. 13, 106 S.Ct. at 2183 n. 13 (quoting 18 Pa.Cons.Stat. § 3210(b) (1982)). Whether "significantly greater" in this context means an "increased medical risk," as the majority then concluded, *id.* at 769, 106 S.Ct. at 2183, or "nonnegligible" or "real and identifiable," as two dissenters noted, *id.* at 807, 106 S.Ct. at 2202 (White, J., dissenting) and 832 (O'Connor, J. dissenting), it is clear that sections 307 and 308 are notably more onerous. Testimony of several of defendants' witnesses underscores the health burden that these statutes place on a woman's right to choose to have an abortion. Dr. Cruikshank, an expert witness for defendants, defined "grave" as "[l]oss of structure or function, shortening of life, irremedial pain and suffering." Aplt.App. at 95. Dr. Richard Hebertson, another of defendants' witnesses, testified that "grave" is synonymous with "[s]erious, complex, threatening." *Id.* at 93. As admitted by defendants' witnesses, the woman must suffer serious or threatening "loss of structure or function," "shortening of life," or "irremedial pain and suffering" before her interests take precedence over the unborn child's interests.

Defendants argue that the relevant portions of *Thornburgh* were uprooted by *Casey* and cannot legitimately support a decision to hold sections 307 and 308 unconstitutional. Specifically, defendants assert that *Thornburgh* was a progeny of *Roe* and that *Casey*'s discrediting of some aspects of *Roe* necessarily discredits *Thornburgh*. We disagree. While we recognize that *Casey* rejects *Roe*'s trimester framework, *Thornburgh* does not rely decisively on that framework in invalidating the Pennsylvania statute. *Casey* ad-

---

cal skills to attempt to promote, preserve and maintain the life of any unborn child sufficiently developed to have any reasonable possibility of survival outside of the mother's womb.

8. The Pennsylvania statute invalidated in *Thornburgh* read as follows:

"Every person who performs or induces an abortion after an unborn child has been determined to be viable shall exercise that degree of professional skill, care and diligence which such person would be required to exercise in order to preserve the life and health of any unborn child intended to be born and not

aborted and the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be aborted alive unless, in the good faith judgment of the physician, that method or technique would present a significantly greater medical risk to the life or health of the pregnant woman than would another available method or technique and the physician reports the basis for his judgment."

*Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 768 n. 13, 106 S.Ct. 2169, 2183 n. 13, 90 L.Ed.2d 779 (1986) (quoting 18 Pa.Cons. Stat. § 3210(b) (1982)).

mittedly replaces *Roe*'s strict scrutiny with an "undue burden" analysis, and we now invalidate a state abortion regulation only "if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, —— U.S. at ——, 112 S.Ct. at 2821. However, *Casey* explicitly reaffirms *Roe*'s approach to post-viability abortions:

> We also reaffirm *Roe*'s holding that 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*'

*Casey*, —— U.S. at ——, 112 S.Ct. at 2821 (quoting *Roe v. Wade*, 410 U.S. 113, 164–65, 93 S.Ct. 705, 732–33, 35 L.Ed.2d 147 (1973) (emphasis added)). *Casey* does not disturb *Roe*'s approach to post-viability regulation. *Roe* therefore continues to govern the relevant portion of *Thornburgh* dealing with choice of method restrictions on post-viability abortions.[9]

In invalidating Pennsylvania's choice of method statute, *Thornburgh* emphasized that the woman's health must be the physician's "paramount consideration." *Thornburgh*, 476 U.S. at 768–69, 106 S.Ct. at 2183. This is consistent with the holding in *Roe*, reaffirmed in *Casey*, that limits the state's ability to regulate post-viability abortions when " 'preservation of the life or health of the mother' " is at issue. *Casey*, —— U.S. at ——, 112 S.Ct. at 2821 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. at 732–33). The importance of maternal health is a unifying thread that runs from *Roe* to *Thornburgh* and then to *Casey*. In fact, defendants concede that *Thornburgh*'s admonition that a woman's health must be the paramount concern remains vital in the wake of *Casey*. Aplee.Br. at 36 ("Maternal health, not fetal survival, remains the physician's paramount consider-

ation."). The Utah choice of method provisions violate this consistent strain of abortion jurisprudence.

Sections 307 and 308 dictate that the unborn child's life must take precedence over the woman's health absent a risk of "grave damage to her medical health." "Grave damage" is clearly a higher standard than the Supreme Court has articulated. According to *Casey*, *Thornburgh*, and *Roe*, concern for the "preservation" of a woman's health suffices to elevate her liberty interests decisively above those of the state or the unborn child. By requiring a woman to suffer "grave damage" to her health before her liberty interests predominate, the Utah legislature violated those portions of *Roe* and *Thornburgh* that *Casey* reaffirmed, and unconstitutionally devalued a woman's privacy rights.

Defendants argue in the alternative that the Court in *Thornburgh* invalidated the Pennsylvania statute because it required "the mother to bear an increased medical risk in order to save her viable fetus," Aplee.Br. at 36–37 (quoting *Thornburgh*, 476 U.S. at 769, 106 S.Ct. at 2183), and contend that "the Utah statute does not require the mother to bear any increased medical risk in order to save her viable fetus." Aplee.Br. at 37. Defendants correctly note that sections 307 and 308 only affect women who are seeking post-viability abortions "to prevent grave damage to the pregnant woman's medical health" and "to save the pregnant woman's life." Utah Code Ann. § 76–7–302(3).[10] Defendants argue that because "[t]he standard cited in sections 76–7–307 and 308, concerning the need to protect the mother's life and medical health, is the same standard that must be met to permit the post-viability abortion in the first place," Aplee.Br. at 34, "the woman faces no increased risk." *Id.* at 37. But we have already concluded that section 302(3) is invalid. The "grave damage" standard in sections 307 and 308 no longer has a vital

---

9. We recognize that *Casey* overruled those portions of *Thornburgh* that deal with informed consent. *See Thornburgh*, 476 U.S. at 759–768, 106 S.Ct. at 2178–83.

10. Defendants concede that it would be antithetical to legislative intent to assure survival of

the unborn child pursuant to sections 307 and 308 when the motivation for the abortion was to prevent "the birth of a child that would be born with grave defects." Utah Code Ann. § 76–7–302(3). Aplee.Br. at 33–34 n. 12.

analog in the post–20 week abortion ban. Furthermore, defendants' analysis erroneously conflates the health risks attendant with continued pregnancy and the health risks attendant with a particular abortion method. A woman may opt for a post-viability abortion because continued pregnancy would cause "grave damage" to her health or jeopardize her life. Under the statute, however, she may have to endure additional health damage and suffering if the method most likely to save her unborn child's life, for example Cesarean section, would itself inflict damage, albeit not "grave" damage, on her health. Contrary to defendants' assertion, sections 307 and 308 clearly demand that a woman bear an "increased medical risk" in order to save the life of a viable fetus.

We hold that sections 307 and 308 impose an undue burden upon a woman's right to choose to terminate a pregnancy, and we reverse the district court's disposition of this claim.

## V.

Law is a dialectic. Legislatures speak and courts review. In the instant case, the district court violated this separation of powers by ignoring legislative intent with regard to the severability of section 302(3) and rewriting the fetal experimentation ban in section 310. We also hold that the choice of method provisions in sections 307 and 308 unconstitutionally encroach upon the woman's liberty interests. We therefore REVERSE the district court's disposition of these claims. We reject plaintiffs' argument that the serious medical emergency exception, section 315, is not severable from the invalidated portions of the statute and therefore AFFIRM the district court's decision with regard to that section.

We AFFIRM in part and REVERSE in part.