379 F.3d 531
 TUCSON WOMAN'S CLINIC, on behalf of themselves and their patients seeking abortions; Damon Raphael, M.D.; Robert H. Tamis, M.D.; Old Pueblo Family Planning; William Richardson, M.D.; Simat Corp. dba Abortion Services of Phoenix, Plaintiffs-Appellants,
v.
Catherine EDEN, in her capacity as the Director of Arizona Department of Health Services; Richard M. Romley, in his capacity as Maricopa County Attorney; Terry Goddard, Defendants-Appellees.
Tucson Woman's Clinic, on behalf of themselves and their patients seeking abortions; Damon Raphael, M.D.; Robert H. Tamis, M.D.; Old Pueblo Family Planning; William Richardson, M.D.; Simat Corp. dba Abortion Services of Phoenix, Plaintiffs-Appellees,
v.
Catherine Eden, in her capacity as the Director of Arizona Department of Health Services; Terry Goddard, Defendants-Appellants, and
Richard M. Romley, in his capacity as Maricopa County Attorney, Defendant.
Tucson Woman's Clinic, on behalf of themselves and their patients seeking abortions; Damon Raphael, M.D.; Robert H. Tamis, M.D.; Old Pueblo Family Planning; William Richardson, M.D.; Simat Corp. dba Abortion Services of Phoenix, Plaintiffs-Appellees,
v.
Catherine Eden, in her capacity as the Director of Arizona Department of Health Services; Terry Goddard, Defendants, and
Richard M. Romley, in his capacity as Maricopa County Attorney, Defendant-Appellant.
 No. 02-17375.
 No. 02-17381.
 No. 02-17382.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 4, 2003.
 Filed June 18, 2004.
 Amended August 23, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Bonnie Scott Jones, Center for Reproductive Rights, New York, NY, for the plaintiffs-appellants and cross-appellees.
 Kevin D. Ray and Lynne C. Adams, Office of the Arizona Attorney General, Phoenix, AZ, for defendants-appellees and cross-appellants Catherine Eden and Terry Goddard.
 Denise M. Burke, Special Deputy Maricopa County Attorneys, San Antonio, Texas; Nicholas T. Nikas, Deputy Maricopa County Attorney, Phoenix, AZ, for defendant-appellee and cross-appellant Richard M. Romley.
 Appeal from the United States District Court for the District of Arizona; Raner C. Collins, District Judge, Presiding. D.C. No. CV-00-00141-RCC.
 Before: TASHIMA, THOMAS, and SILVERMAN, Circuit Judges.
 
 ORDER
 
 1
 The opinion filed June 18, 2004, 371 F.3d 1173, is hereby amended as follows:
 
 
 2
 "We affirm, and also find that the fourth requirement violates informational privacy rights," 371 F.3d at 1193, is replaced by, "We affirm, and also hold that the fourth requirement does not violate informational privacy rights."
 
 
 3
 With the amendment, the Petitions for Rehearing are denied. The full court has been advised of the Petitions for Rehearing En Banc and no judge of the court has requested a vote on the Petitions for Rehearing En Banc. Fed. R.App. P. 35. Therefore, the Petitions for Rehearing En Banc are denied. No further petition for rehearing or rehearing en banc will be accepted in these cases.
 
 OPINION
 
 4
 THOMAS, Circuit Judge.
 
 
 5
 Plaintiffs in this case are physicians who provide abortions in their private medical practices in Arizona. They challenge the constitutionality of a statutory and regulatory scheme which requires the licensing and regulation of any medical facility in which five or more first trimester abortions in any month or any second or third trimester abortions are performed. The district court granted summary judgment in part to plaintiffs, and in part to defendants. We affirm in part, reverse in part, and remand for further proceedings on plaintiffs' claim that the scheme poses an undue burden on the right to abortion.
 
 I. Factual and Procedural Background[1]
 
 6
 Prior to the promulgation of the statutory and regulatory scheme at issue in this case, the Arizona Department of Health Services (DHS) was explicitly denied authority to regulate any private physician office or clinic of a licensed health care provider unless patients were kept overnight or administered general anesthesia. The state alleges that the statutory scheme, passed in 1999, was implemented in response to the highly publicized death of Lou Anne Herron, a patient who bled to death while recovering in an abortion clinic following an extremely substandard abortion provided by Dr. John Biskind, but plaintiffs contest this characterization of the State's motivation. The statute singles out abortion providers who provide five or more first trimester abortions, or any second or third trimester abortions, in a month, and it subjects all such providers to the licensing requirements imposed on health care institutions. It also directs DHS to promulgate regulations regarding facilities that perform abortions. The regulations that DHS has issued set mandatory standards in many areas of practice: administration, personnel, staffing requirements, the abortion procedure itself, patient transfer and discharge, medications, medical records, equipment, and physical facilities. The regulations also require the providers to submit to warrantless, unbounded inspections of their offices and provide DHS inspectors access to unredacted medical records. Amendments to the scheme passed in 2000 additionally require physicians who perform abortions after the first trimester to submit ultrasound prints to a DHS contractor for review. Violations of the scheme result in criminal and civil penalties, but enforcement of the entire set of statutes and regulations has been enjoined during district court proceedings and the outcome of all appeals pursuant to stipulation.
 
 
 7
 Plaintiffs claim the regulation of their practices is unconstitutional in the following eight ways: (1) It poses an undue burden on the right to abortion; (2) It violates the equal protection rights of physicians and their patients by distinguishing between those who provide abortions and those who provide other comparably risky medical services; (3) It violates the equal protection rights of physicians by distinguishing between those who provide fewer than five first trimester abortions a month and those who provide five or more, or any second or third trimester abortions; (4) It violates the equal protection rights of women by distinguishing between medical services sought by women and comparably risky procedures sought by men; (5) It violates physicians' Fourth Amendment rights by permitting warrantless searches of their offices; (6) It violates patients' informational privacy rights by requiring DHS access to unredacted records, disclosure of ultrasound prints with patient identifying information to a private contractor, allowing unannounced searches by DHS when patients may be in the facility, and by requiring physicians to release sensitive patient information including patient name to a licensing board when there is an "incident" with the patient; (7) One of its provisions is unconstitutionally vague; and (8) It violates the due process rights of physicians and their patients by requiring a physician with hospital admitting privileges to be on premises until all patients are discharged, and thereby unlawfully delegating to hospitals the licensing of abortion providers. Plaintiffs also claim the unconstitutional portions of the scheme are not severable.
 
 
 8
 The parties filed cross-motions for summary judgment, but plaintiffs never moved for summary judgment on their undue burden claim, which they believe requires a trial. Plaintiffs were granted summary judgment on most of the Fourth Amendment, informational privacy, and vagueness challenges described above. Defendants were granted summary judgment on the undue burden and equal protection claims, and the district court found the unconstitutional portions of the scheme were severable from the constitutional ones. Plaintiffs and defendants cross-appeal from all grants of summary judgment to the opposing parties, and with the exception of the undue burden claim, they each argue that summary judgment should have been granted in their favor. With respect to the undue burden claim, plaintiffs do not argue that summary judgment was warranted in their favor, but instead argue that a bench trial was warranted. Plaintiffs further appeal the finding of severability.
 
 
 9
 We reverse and remand on plaintiffs' undue burden claim. Plaintiffs have submitted sufficient evidence to create an issue of material fact as to whether the scheme creates an undue burden on the right to seek an abortion in violation of the United States Constitution.
 
 
 10
 We affirm the district court's grant of summary judgment to defendants on all equal protection claims. The scheme does not violate the equal protection clause in a judicially cognizable manner by distinguishing between doctors who perform less rather than more abortions, by distinguishing between abortion providers and other physicians, or by distinguishing between abortion, sought only by women, and comparably risky medical procedures sought by men.
 
 
 11
 We also affirm the district court's grants of partial summary judgment to plaintiffs on their Fourth Amendment, informational privacy, and vagueness claims. The scheme's authorization of boundless, warrantless searches of physicians' offices violates the Fourth Amendment. The scheme's requirement that clinics submit, upon request made by DHS in its absolute discretion, unredacted patient files containing name, address, and other patient identifying information violates patients' informational privacy rights. The scheme's requirement that doctors send ultrasound prints to a private contractor also violates patients' informational privacy rights. The scheme's requirement that patient identifying information be released to a professional licensing board after an "incident" also violates patients' informational privacy rights. None of these release requirements is mitigated by sufficient safeguards against unnecessary access or wider release of the information. Last, the regulation requiring physicians to "ensure that a patient is ... treated with consideration, respect, and full recognition of the patient's dignity and individuality," Ariz. Admin. Code R9-10-1507(1), is unconstitutionally vague. Because we remand on the undue burden claim, we do not reach the issue of severability at this time.
 
 II. Jurisdiction and Standard of Review
 
 12
 The district court had subject matter jurisdiction under 28 U.S.C. § 1331 (2000) because this case arises under the Fourteenth Amendment to the Constitution, and state officials can be sued for constitutional violations under 42 U.S.C. § 1983. We have jurisdiction under 28 U.S.C. § 1291.
 
 
 13
 Appeals from the grant or denial of summary judgment are reviewed de novo, Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1175 (9th Cir.2002), as are constitutional questions, Servin-Espinoza v. Ashcroft, 309 F.3d 1193, 1196 (9th Cir.2002). In reviewing a grant of summary judgment, we must view the evidence in the light most favorable to the non-moving party. If there are any genuine issues of material fact, summary judgment is not warranted. Balint v. Carson City, Nev., 180 F.3d 1047, 1050 (9th Cir.1999) (en banc).
 
 
 14
 In United States v. Salerno, the Supreme Court held that one facially challenging a statute "must establish that no set of circumstances exists under which the Act would be valid. ... [W]e have not recognized an `overbreadth' doctrine outside the limited context of the First Amendment." 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In Planned Parenthood v. Casey, however, the Court held that an abortion law is unconstitutional on its face if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
 
 
 15
 With respect to plaintiffs' undue burden claim, we follow the Casey standard. Planned Parenthood v. Lawall, 180 F.3d 1022, 1027 (9th Cir.1999) (Lawall I). With respect to other facial constitutional challenges, we generally follow the Salerno standard. S.D. Myers, Inc. v. City & County of San Francisco, 253 F.3d 461, 467 (9th Cir.2001). That abortion rights are involved does not alter this rule. Indeed, it is difficult to even articulate what application of the Casey standard to claims other than the undue burden claims would entail. Therefore, we apply the Salerno standard to all of plaintiffs' claims except their undue burden claim.
 
 III. Undue Burden Claim
 
 16
 
 a. When the Undue Burden Standard is Triggered
 
 
 
 17
 Women have a fundamental liberty interest, protected by the due process clause of the Fourteenth Amendment, in obtaining an abortion. Casey, 505 U.S. at 845-46, 112 S.Ct. 2791. In Casey, the Supreme Court reaffirmed this central holding of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Casey, 505 U.S. at 845-46, 112 S.Ct. 2791. The Court also explained that the right to obtain an abortion is not absolute and that state interests in maternal health and protecting fetal life can, in some circumstances, justify regulations of abortion. Id. at 846, 112 S.Ct. 2791. However, a plurality of the Court abandoned both traditional equal protection scrutiny analysis and the accompanying trimester framework of Roe for determining when state regulation of abortion to promote these two important interests is justified and when it is not. Id. at 872-76, 112 S.Ct. 2791. The trimester framework and the traditional equal protection scrutiny analysis for laws impacting fundamental rights were replaced with an "undue burden" standard in cases where regulation of abortion is used to promote maternal health or fetal life. Id. at 876, 112 S.Ct. 2791.
 
 
 18
 This standard had been applied in inconsistent ways in prior abortion rights cases by various Supreme Court Justices. Id. (citing numerous cases). Therefore, the Casey opinion clarified the meaning of "undue burden" by defining it as "shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. at 877, 112 S.Ct. 2791. In its "summary" of the essential holdings of the case, Casey made clear that the undue burden standard applies to health regulations:
 
 
 19
 As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.
 
 
 20
 Id. at 878, 112 S.Ct. 2791. But because Casey largely dealt with a law aimed at promoting fetal life, its application of the "undue burden" standard is often not extendable in obvious ways to the context of a law purporting to promote maternal health. See, e.g., A Woman's Choice-East Side Women's Clinic v. Newman, 305 F.3d 684 (7th Cir.2002) (majority and dissenting opinions representing very different views of the role of the record); Greenville Women's Clinic v. Bryant, 222 F.3d 157 (4th Cir.2000) (majority and dissenting opinions representing very different views of the standard in assessing a licensure scheme similar to the one challenged here).
 
 
 21
 In the context of a law purporting to promote fetal life, whatever obstacles that law places in the way of women seeking abortions logically serve the interest the law purports to promote — fetal life — because they will prevent some women from obtaining abortions. By contrast, in the context of a law purporting to promote maternal health, a law that is poorly drafted or which is a pretext for anti-abortion regulation can both place obstacles in the way of women seeking abortions and fail to serve the purported interest very closely, or at all. Indeed, in his concurring opinion in Casey, Justice Stevens indicated that a burden need not be onerous to be undue, if it is not supported by a legitimate state interest. 505 U.S. at 920-21, 112 S.Ct. 2791 (Stevens, J., concurring in part and dissenting in part). Moreover, where Casey did entertain the possibility that the Pennsylvania law at issue promoted maternal health, it took care to verify that the law could be reasonably understood to promote, in some legitimate fashion, the interest in maternal mental health:
 
 
 22
 To the extent Akron I and Thornburgh [v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)] find a constitutional violation when the government requires, as it does here, the giving of truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the "probable gestational age" of the fetus, those cases go too far, are inconsistent with Roe's acknowledgment of an important interest in potential life, and are overruled.... It cannot be questioned that psychological well-being is a facet of health.... In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.
 
 
 23
 Id. at 882, 112 S.Ct. 2791 (emphasis added).
 
 
 24
 Thus, the undue burden standard is not triggered at all if a purported health regulation fails to rationally promote an interest in maternal health on its face, as would be the case where the state required physicians to provide false or misleading information to women seeking abortions. Plaintiffs in this case argue that the entire licensing scheme at issue does not even rationally promote an interest in maternal health, and that the statutes and regulations therefore clearly infringe the right to abortion and violate the Constitution, since the undue burden standard is not triggered.
 
 
 25
 Mazurek v. Armstrong, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), provides an example of how laws that purport to promote health, but may in fact fail to do so, should be analyzed. The Court in Mazurek was faced with such a law but still applied the undue burden standard. Id. 520 U.S. at 973, 117 S.Ct. 1865 ("`[O]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others.'") (quoting Casey, 505 U.S. at 885, 112 S.Ct. 2791). The physician-only abortion provision at issue in Mazurek was subject to the undue burden standard, even in the face of evidence that it was objectively unnecessary, and could therefore only potentially injure maternal health by reducing the number of abortion providers. Id. Thus, Mazurek compels us to hold that where a health regulation of abortion is not facially pretextual or irrational with respect to the interest it purports to assert, it is subject to the "substantial obstacle" test in Casey.
 
 
 26
 Although plaintiffs have presented a great deal of evidence supporting the inference that the statutory and regulatory scheme will actually worsen maternal health and safety, as a facial matter, the scheme as a whole is a typical set of health and safety standards, unusual primarily because it singles out abortion clinics. Moreover, the legislative history indicates that at least one of the triggers for enacting the scheme was the death of a patient at an abortion clinic engaging in atrociously substandard practices. In the face of this clear history, plaintiffs have not presented evidence sufficient to create an issue of material fact as to whether this licensing scheme is a pretext for restricting the right to abortion. See infra note 2. Thus, their claim that the scheme infringes abortion rights must be analyzed under Casey's undue burden standard.
 
 
 27
 
 b. The Summary Judgment Standard
 
 
 
 28
 Casey made clear that the "substantial obstacle" standard for determining when a law poses an undue burden on the right to obtain an abortion is record-dependent. 505 U.S. at 901, 112 S.Ct. 2791 ("While at some point increased cost could become a substantial obstacle, there is no such showing on the record before us.").
 
 
 29
 In Greenville Women's Clinic, the Fourth Circuit overturned a district court's finding that plaintiffs had demonstrated that a very similar regulatory scheme amounted to an 11877 undue burden on abortion rights. 222 F.3d at 159. The Fourth Circuit determined that as a matter of law, plaintiffs had not shown that the regulatory scheme at issue amounted to an undue burden on abortion rights. The dissent summarized the numerous findings of fact the district court had made after a six-day bench trial which it felt compelled the opposite result. 222 F.3d at 175-76. (Hamilton, J., dissenting).
 
 
 30
 We depart from the Fourth Circuit's holding in Greenville Women's Clinic to the extent it neglects that "[a] significant increase in the cost of obtaining an abortion alone can constitute an undue burden on the right to have an abortion." 222 F.3d at 201 (Hamilton, J., dissenting) (citing Casey, 505 U.S. at 901, 112 S.Ct. 2791). A significant increase in the cost of abortion or the supply of abortion providers and clinics can, at some point, constitute a substantial obstacle to a significant number of women choosing an abortion. Plaintiffs in this case have raised an issue of material fact as to whether the Arizona scheme creates such an obstacle. We note that in Greenville, the district court did not grant summary judgment in favor of the state. Rather, the district court held a bench trial, facilitating findings of fact far more specific than the conclusory finding the court below made.
 
 
 31
 To survive a motion by the state for summary judgment on an undue burden claim, specific allegations of the dollar amount by which abortion costs will rise are not required. Rather, the usual summary judgment standards apply, and all inferences from the evidence must be made in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A grant of summary judgment to defendants is inappropriate if plaintiffs have submitted evidence sufficient to create an issue of material fact as to whether a health regulation is unnecessary and has the purpose or effect of imposing a substantial obstacle to women seeking an abortion. See, e.g., Kearney v. Standard Ins. Co., 175 F.3d 1084, 1093-94 (9th Cir. 1999) (en banc). Here, a reasonable fact-finder could find that the challenged set of statutes and regulations is unnecessary and has the effect of imposing a substantial obstacle on women seeking an abortion.
 
 
 32
 The district court's characterization of plaintiffs' evidence as "undetermined fee increases predicted by abortion providers, but not supported by specific credible estimates" is incomplete and fails to draw all inferences in favor of the plaintiffs. See Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir.2003). Plaintiffs have presented evidence and testimony that individual providers will incur tens of thousands of dollars in expenses complying with the scheme. These estimates are based on specific costs, such as purchasing a camera for an ultrasound machine, investing time in complying with the heavy administrative burdens of the law, hiring nurses where previously medical assistants were used, and paying employees overtime so that follow-up calls can be made on weekends. Plaintiffs have presented testimony that one provider may be forced to stop practicing medicine altogether, and that a Planned Parenthood clinic will see an approximately two-thirds drop in the number of its physicians. Plaintiffs have placed into evidence expert testimony concerning the fact that increased monetary cost delays and deters patients obtaining abortions, and that delay in abortion increases health risks. They have also presented evidence tending to show that abortion is a very low-risk procedure most of the time, that it entails equal or even less risk than many other procedures not similarly regulated in Arizona, and that the regulations are therefore unnecessary as a matter of public health. Therefore, a reasonable factfinder could certainly conclude, from the evidence presented, that the licensing scheme at issue is unnecessary and that, by increasing the cost of abortion and limiting the supply of abortion providers and hours during which they can provide abortions, it imposes a substantial obstacle to women seeking abortions at those practices and clinics.
 
 
 33
 As in any case, there must be more than a "scintilla" of evidence favoring the non-moving party to create an issue of material fact, Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir.1997) (citing Anderson, 477 U.S. at 252, 106 S.Ct. 2505), but plaintiffs in this case have presented far more than a scintilla of such evidence. They are therefore entitled to a bench trial and specific findings of fact by the district court as to the impact these burdens will have on women seeking abortions.
 
 
 34
 The district court noted in its order that it would not weigh, in assessing the undue burden claim, certain of the burdens imposed on providers and patients. With respect to most of these requirements, it made sense for the district court to discount these burdens, as it had already determined that those provisions were unconstitutional and severable from the rest of the law, and would enjoin their enforcement. However, with respect to the admitting privileges requirement, the district court erred in discounting the burdens imposed by this requirement. The district court found this requirement enforceable, as do we, see infra Part VIII. We therefore direct the district court to take account of the evidence plaintiffs have submitted concerning the burdens this requirement imposes, such as the onerousness of applying for privileges, attending staff meetings, and taking one's share of emergency on-call time.
 
 
 35
 The district court stated that the scheme's stigmatizing of abortion practice and usurping of providers' ability to exercise medical judgment were "not appropriate questions" for it to consider. Whether or not these burdens are strong enough to alter the ultimate outcome in this case, there is no indication in Casey or any other case that such burdens are somehow irrelevant to the analysis of whether a law imposes a substantial obstacle to seeking an abortion. Plaintiffs presented expert testimony concerning the effects of stigmatization of abortion on the supply of abortion providers, and the district court is therefore directed, in its role as factfinder, to give these burdens their appropriate weight on remand.
 
 IV. Equal Protection Claims
 
 36
 Plaintiffs argue that the scheme violates the Equal Protection Clause of the Fourteenth Amendment in three ways: (1) violating the equal protection rights of both patients and physicians by discriminating between doctors who provide abortions and those who provide comparably risky medical procedures; (2) violating the equal protection rights of physicians by discriminating between doctors who provide more abortions and those who provide fewer abortions; and (3) violating the equal protection rights of women by discriminating between abortion, a procedure sought only by women, and comparably risky procedures sought by men.
 
 
 37
 Laws alleged to violate the equal protection clause are generally subject to one of three levels of "scrutiny" by courts: strict scrutiny, intermediate scrutiny, or rational basis review. Laws are subject to strict scrutiny when they discriminate against a suspect class, such as a racial group, e.g., Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), or when they discriminate based on any classification but impact a fundamental right, such as the right to vote. E.g., Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Laws are subject to intermediate scrutiny when they discriminate based on certain other suspect classifications, such as gender. Miss. Univ. for Women v. Hogan, 458 U.S. 718, 723, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). With respect to laws discriminating on the basis of gender, the particular history of sex discrimination has led to judicial recognition that certain forms of purported state interest are illegitimate as justifications for sex discrimination, such as interests stemming from romantic paternalism toward women or sex stereotyping. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 152-53, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); Miss. Univ. for Women, 458 U.S. at 728-29, 102 S.Ct. 3331; Frontiero v. Richardson, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).
 
 
 38
 All other laws are subject to rational basis review. Fitzgerald v. Racing Ass'n, 539 U.S. 103, 106-07, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003). A law will survive rational basis review "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Although it is difficult to show that a law violates the equal protection clause under rational basis review, it is not impossible, since some laws are so irrational or absurd on their face it is clear they can be motivated by nothing other than animus or prejudice against a group. See, e.g., Romer, 517 U.S. at 632, 116 S.Ct. 1620; see also City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 448-49, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
 
 
 39
 
 a. Singling out Doctors who Provide Abortions
 
 
 
 40
 Plaintiffs argue that discrimination between abortion and comparable medical procedures should be subject to strict scrutiny because it impacts abortion rights as well as informational privacy rights, and both of these are fundamental rights protected by the due process clause. They argue that this claim is not the same as a claim that the scheme unconstitutionally infringes the abortion liberty interest, because the test for when a law is subject to strict scrutiny is when that law impacts a fundamental right, not when it infringes it. See Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (holding that because a "classification of welfare applicants according to whether they have lived in the State for one year ... touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a compelling state interest"), overruled in part on other grounds by Edelman v. Jordan, 415 U.S. 651, 670-71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).
 
 
 41
 The right to abortion is a fundamental constitutional right. Casey explicitly reaffirmed Roe's holding in this regard, stating that "[e]ven on the assumption that the central holding of Roe was in error, that error would go only to the strength of the state interest in fetal protection, not to the recognition afforded by the Constitution to the woman's liberty." 505 U.S. at 858, 112 S.Ct. 2791. See also Stenberg v. Carhart, 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). However, Casey defined a new standard of judicial review for determining when courts can recognize burdens on that right as unconstitutional, and when they cannot, replacing the traditional scrutiny analysis with the undue burden test:
 
 
 42
 As our jurisprudence relating to all liberties save perhaps abortion has recognized, not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right. An example clarifies the point. We have held that not every ballot access limitation amounts to an infringement of the right to vote. Rather, the States are granted substantial flexibility in establishing the framework within which voters choose the candidates for whom they wish to vote.
 
 
 43
 Casey, 505 U.S. at 873-74, 112 S.Ct. 2791 (citing Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); Norman v. Reed, 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). There can be no doubt that voting is a fundamental right, but the ballot access cases cited in Casey intimated that strict scrutiny was nevertheless not warranted for all laws impacting the right to vote, and Burdick v. Takushi, another ballot access case, made that crystal clear: "Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold." 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).
 
 
 44
 By citing the ballot access cases, Casey directly replaced strict scrutiny review of laws that do not directly burden abortion and purportedly promote maternal health with the undue burden standard, just as the ballot access cases replaced strict scrutiny with a less stringent standard of review for reasonable laws regulating ballot access rather than infringing the core voting right. Thus, with respect to burdens on patients' abortion rights, this equal protection claim collapses with the undue burden claim, which we have addressed above.
 
 
 45
 Plaintiffs also point out that the scheme burdens patients' fundamental rights to informational privacy. Like burdens on the right to abortion, burdens on informational privacy that the state justifies via public health or other such interests are assessed under a specific, detailed test that balances informational privacy and governmental interests. See infra Part VI; Planned Parenthood v. Lawall, 307 F.3d 783, 790 (9th Cir.2002) (Lawall II). Like the Casey undue burden standard, that test replaces any strict scrutiny test, and therefore, it must govern. Thus, to the extent the law infringes on informational privacy, this claim collapses with the informational privacy claim, discussed separately below.
 
 
 46
 However, doctors who perform abortions have rights, separate and apart from the rights of their patients, to be free from discrimination, and we must determine whether the law, in singling them out, violates their rights under the equal protection clause.
 
 
 47
 We must first determine whether any heightened level of scrutiny should be afforded doctors who perform abortions, as a suspect class under the equal protection clause. Discrimination against a class is more likely to be deemed suspect under the equal protection clause when the class has experienced a "history of purposeful unequal treatment." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). However, the basic purpose of employing strict scrutiny is to recognize that certain "factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy — a view that those in the burdened class are not as worthy or deserving as others." Cleburne, 473 U.S. at 440, 105 S.Ct. 3249. Thus, even when a class has experienced a history of discrimination and prejudice, it is not appropriate to afford that class suspect status under the equal protection clause where there are also many legitimate reasons that the state might single out the class for regulation. Id. at 442-45, 105 S.Ct. 3249. There are many such reasons here.
 
 
 48
 For instance, a State might find or presume that women who obtain abortion services are less likely to report irresponsible practices or less likely to litigate medical malpractice claims, due to the fact that obtaining an abortion is an exercise of a private choice. A State might look to the history of illegal, unsafe abortions in this country and determine that women seeking abortions are particularly vulnerable to exploitation. States must be permitted to take account of that history and respond to it in the exercise of their legislative judgment. We do not endorse the particular legislative response in this case, or any other. There is clear room for disagreement about the effects of treating abortion differently than other services. Such differential treatment might backfire by stigmatizing the practice of abortion. However, legislatures are more properly suited than courts to predicting these effects, and we do not believe that the legislative response to a history of marginalization is per se subject to strict scrutiny in all situations. Cf. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 229, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).
 
 
 49
 We nevertheless recognize that abortion providers can be a politically unpopular group. Cleburne employed rational basis review for laws classifying the mentally retarded, but acknowledged that "[d]oubtless, there have been and there will continue to be instances of discrimination against the retarded that are in fact invidious, and that are properly subject to judicial correction under constitutional norms." 473 U.S. at 446, 105 S.Ct. 3249. Although Cleburne employed rational basis review, it invalidated the law at issue, explaining that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." Id. In Romer v. Evans, a law discriminating on the basis of sexual orientation was struck down under rational basis review, because the "sheer breadth[of the law was] so discontinuous with the reasons offered for it that the amendment seem[ed] inexplicable by anything but animus toward the class it affect[ed]." 517 U.S. at 632, 116 S.Ct. 1620.
 
 
 50
 Applying this standard to the case here, we find that the scheme survives rational basis review. Plaintiffs have alleged that most, if not all, of the scheme is unnecessary and stigmatizes abortion providers. However, the law is facially related to health and safety issues, and no evidence has been presented that is sufficient to create an issue of material fact as to whether there is a stigmatizing or animus based purpose to the law.[2] In contrast, the law at issue in Romer was breathtaking in its sweep and the most basic human rights at which it directly struck, excluding non-heterosexuals even from securing equal rights with respect to common carriers and public accommodations. Id. at 628-30, 116 S.Ct. 1620. Thus, the classification in this case survives rational basis review.
 
 
 51
 
 b. Singling Out Doctors Who Provide More, Rather than Fewer, Abortions
 
 
 
 52
 With respect to this classification, plaintiffs do not assert the fundamental liberty interests of their patients. Because the right to perform abortions is derivative of the right of patients to seek abortions, it is not the sort of fundamental right that, apart from the rights of patients, would trigger strict scrutiny review. See Casey, 505 U.S. at 884, 112 S.Ct. 2791 (giving both the doctor-patient relation and abortion providers' First Amendment rights the same constitutional review they receive in contexts having nothing to do with abortion).
 
 
 53
 For the same reasons that abortion providers are not a suspect class, we hold that those who provide larger numbers of abortions are not a suspect class, because a legislature might believe that a doctor with shoddy practices can engender more harm if he or she is performing many rather than a few abortions. Thus, this classification is subject only to rational basis review.
 
 
 54
 The State has asserted the rationale that the classification here attempts to "balance the additional requirements that licensing would impose upon abortion providers with the desire to protect the health and welfare of women seeking abortions." Generally, such line drawing survives rational basis review because it "account[s] for limitations on the practical ability of the State to remedy every ill." Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). See also Women's Med. Ctr. v. Bell, 248 F.3d 411, 419 (5th Cir.2001) (making this point in denying a similar claim that an abortion regulation limiting its scope to those providing 300 or more abortions a year violated the equal protection clause); Greenville Women's Clinic, 222 F.3d at 174. (upholding a similar classification of clinics providing five first trimester abortions or more per month and making analogies to federal employment discrimination law exempting small employers).
 
 
 55
 Of course, the fact that a classification rests in part on a numerical determination does not insulate it from any level of scrutiny whatsoever. The district court in Women's Med. Ctr. of N.W. Houston v. Archer struck down the classification at issue there because it found that the place the legislature had drawn its line was absurd, 159 F.Supp.2d 414, 465 n. 30 (S.D.Tex.1999).
 
 
 56
 However, the State's asserted rationale in this case — that smaller practices would be unduly burdened by the comprehensive legislation — is legitimate as a general matter, since the requirements are quite burdensome, especially for smaller private practices. While we might imagine more precise ways to estimate practice size than the raw number of abortions a doctor provides per month, we cannot say that the classification chosen by the Arizona legislature as a proxy for relative administrative burden is so absurd as to be irrational on its face.
 
 
 57
 
 c. Singling Out Abortion, Which is Sought only by Women
 
 
 
 58
 If a challenged law discriminates on the basis of gender, then it must normally be subject to intermediate scrutiny: When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse, a twofold inquiry is[] appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.
 
 
 59
 Personnel Adm'r v. Feeney, 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citation omitted).
 
 
 60
 The statutory scheme plaintiffs challenge is gender neutral on its face. As discussed above, plaintiffs have not presented any evidence sufficient to show that the disparate impact of the challenged scheme on women reflects invidious discrimination. Thus, plaintiffs' claim that the law violates the equal protection rights of women must fail unless the statutory classification of abortion providers is not in fact neutral, but rather a "gender-based" classification, by virtue of the fact that only women seek abortion services. If so, then the scheme would normally be subject to intermediate scrutiny.
 
 
 61
 In Geduldig v. Aiello, the Supreme Court held that the denial of disability benefits for pregnant persons only was not equivalent to a gender classification under the equal protection clause, even though only women become pregnant. 417 U.S. 484, 496 n. 20, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). However, imposing a disability on pregnant women might nevertheless amount to sex discrimination under the equal protection clause. Indeed, the Supreme Court recently implied that laws which facially discriminate on the basis of pregnancy, even those that facially appear to benefit pregnant persons, can still be unconstitutional if the medical or biological facts that distinguish pregnancy do not reasonably explain the discrimination at hand:
 
 
 62
 The dissent asserts that four of these schemes ... concern pregnancy disability leave only. But Louisiana provided women with four months of such leave, which far exceeds the medically recommended pregnancy disability leave period of six weeks. This gender-discriminatory policy is not attributable to any different physical needs of men and women, but rather to the invalid stereotypes that Congress sought to counter through the FMLA.
 
 
 63
 Nev. Dep't of Human Resources v. Hibbs, 538 U.S. 721, 733 n. 6, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (citations and internal quotation marks omitted) (identifying various instances of unconstitutional state discrimination on the basis of gender, which provided Congress with the authority to respond with FMLA, remedial and prophylactic legislation passed under section 5 of the Fourteenth Amendment). Hibbs strongly supports plaintiffs' argument that singling out abortion in ways unrelated to the facts distinguishing abortion from other medical procedures is an unconstitutional form of discrimination on the basis of gender.
 
 
 64
 However, Congress, in enacting section 5 legislation, can respond to state action that is unconstitutional regardless of whether a court would be capable of adjudicating that unconstitutionality. See, e.g., Katzenbach v. Morgan, 384 U.S. 641, 649-50, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Thus, Hibbs does not compel the conclusion that this is the sort of discrimination a court can remedy, given the nature of judicial deference to legislative distinctions embodied in equal protection and undue burden jurisprudence.
 
 
 65
 On the other hand, courts have taken notice of the fact that the right to obtain an abortion is tied to the right to be free from sex discrimination in a manner unlike any other medical service that only one gender seeks. Abortion is unique in that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." Casey, 505 U.S. at 856, 112 S.Ct. 2791. However, even if laws singling out abortion can be judicially recognized as not gender-neutral, where such laws facially promote maternal health or fetal life, Casey replaces the intermediate scrutiny such a law would normally receive under the equal protection clause with the undue burden standard.
 
 
 66
 In fact, elements of intermediate scrutiny review particular to sex-based classifications, such as the rules against paternalism and sex-stereotyping, J.E.B., 511 U.S. at 132, 114 S.Ct. 1419; Frontiero, 411 U.S. at 684, 93 S.Ct. 1764, are evident in the Casey opinion, and should be considered by courts assessing the legitimacy of abortion regulation under the undue burden standard. See Casey, 505 U.S. at 882, 112 S.Ct. 2791 (approving only of information provided to a woman seeking an abortion that is "truthful and not misleading"); id. at 898, 112 S.Ct. 2791 ("A State may not give to a man the kind of dominion over his wife that parents exercise over their children. Section 3209 embodies a view of marriage consonant with the common-law status of married women but repugnant to our present understanding of marriage and of the nature of the rights secured by the Constitution.").
 
 
 67
 But given that Casey reaffirms the state's interest in regulating to serve maternal health and promote fetal life, these interests would generally be significant enough to justify sex discrimination under the intermediate scrutiny standard. Therefore, we hold that when the state interest asserted to support a law singling out abortion from comparably risky procedures sought by men is maternal health, it is not necessary to determine whether the classification should be deemed gender-neutral, because the interests at stake should be balanced by simply applying the Casey undue burden standard. This is particularly appropriate because the burden on women engendered by the classification arises entirely out of the burden on abortion, as a service only women seek.
 
 
 68
 Since maternal health is asserted as the state interest justifying the regulation, and since no material issue of fact regarding an invidious purpose behind the regulatory scheme has been created, this claim is not judicially cognizable separately from the undue burden claim, which we have addressed above.
 
 V. Warrantless Searches
 
 69
 A provision of the regulatory scheme requires that licensees "[e]nsure that the Department's director or director's designee is allowed immediate access to the abortion clinic during the hours of operation." Ariz. Admin. Code R9-10-1503(B)(4). No limit to this permission for a warrantless search appears in the regulation, so on its face, the regulation requires that licensees give DHS officials access to the entire abortion clinic. Ariz.Rev.Stat. § 36-424(D) also permits DHS officials broad discretion in entering health care institutions for the purpose of investigating alleged violations. Section 36-424(B) also authorizes DHS to inspect health care institutions "to ascertain whether the applicant and the health care institution are in substantial compliance with the requirements of this chapter and the rules established pursuant to this chapter," and no limitation of this discretion appears on the face of the statute. The district court held that the regulation was unconstitutional, but did not mention the statute specifically in its injunction. We affirm, and also find that the statute itself violates plaintiffs' Fourth Amendment rights.
 
 
 70
 "The Fourth Amendment applies to commercial premises as well as to private homes." United States v. Argent Chem. Labs., Inc., 93 F.3d 572, 575 (9th Cir.1996) (citing See Camara v. City of Seattle, 387 U.S. 541, 546, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967)). Thus, the state may not normally engage in warrantless searches of a private business. However, the state may engage in warrantless searches of a business when the business is closely regulated, under the administrative search exception to the Fourth Amendment's warrant requirement. See United States v. Biswell, 406 U.S. 311, 315, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). Whether a business is closely regulated is "essentially defined by `the pervasiveness and regularity of the [] regulation,' and the effect of such regulation upon an owner's expectation of privacy." New York v. Burger, 482 U.S. 691, 701, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (quoting Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)). In addition, the "duration of a particular regulatory scheme" is an "important factor." Id. In Argent, however, we downplayed the importance of the "duration" factor to this analysis. Argent, 93 F.3d at 576.
 
 
 71
 The following sorts of industries are examples of those deemed closely regulated by either the Supreme Court or the Ninth Circuit: the vehicle dismantling industry, Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601, firearms dealers, Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87, the liquor industry, Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), veterinary drug manufacturers, Argent, 93 F.3d 572, and liquefied propane gas retailers, United States v. V-1 Oil Co., 63 F.3d 909 (9th Cir.1995).
 
 
 72
 With respect to the industry of abortion provision or the industry of private physicians, Arizona did not pervasively regulate the industry until passage of the legislation at issue in the case. Ariz.Rev.Stat. §§ 32-1402, -1403 (providing for physician monitoring by a Board of Medical Examiners comprised of health professionals and members of the public). Moreover, the history of abortion jurisprudence limited close regulation of the industry by subjecting it to strict scrutiny. Thus, the duration element speaks against finding that abortion providers are a closely regulated industry.
 
 
 73
 The challenged scheme itself would regulate abortion providers quite closely, and defendants argue that this brings abortion providers within the closely regulated industry exception. However, while the Arizona regulatory scheme seems to be quite pervasive, in that many aspects of practice are regulated, the "regularity" of regulation is yet to be shown.
 
 
 74
 Moreover, the theory behind the closely regulated industry exception is that persons engaging in such industries, and persons present in those workplaces, have a diminished expectation of privacy. Burger, 482 U.S. at 701, 107 S.Ct. 2636. That theory clearly does not apply to abortion clinics, where the expectation of privacy is heightened, given the fact that the clinic provides a service grounded in a fundamental constitutional liberty, and that all provision of medical services in private physicians' offices carries with it a high expectation of privacy for both physician and patient. Thus, a proper balancing of the factors, especially in the context of the purpose behind the closely regulated industry exception, indicates that abortion clinics are not a closely regulated industry. The other federal courts to examine this question have reached the same conclusion. Margaret S. v. Edwards, 488 F.Supp. 181, 215-17 (E.D.La.1980); Akron Ctr. for Reprod. Health v. City of Akron, 479 F.Supp. 1172, 1205 (N.D.Ohio 1979), aff'd in part and rev'd in part on other grounds, 651 F.2d 1198 (6th Cir.1981), 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983).
 
 
 75
 Because abortion clinics are not a closely regulated industry, the scheme's authorization of warrantless searches of the clinics is unconstitutional under the Fourth Amendment, and we affirm the district court's grant of summary judgment to plaintiffs on this claim.
 
 VI. Informational Privacy
 
 76
 Below, plaintiffs asserted that the scheme violates their patients' informational privacy rights under the Constitution by allowing DHS to access unredacted patient medical records and retain copies in their offices, Ariz. Admin. Code R9-10-1511(A)(4)(b), (c), requiring providers to submit to a private contractor copies of fetal ultrasound prints, Ariz.Rev.Stat. § 36-2301.02(B), (C), and allowing the warrantless searches described above. For the first time on appeal, plaintiffs argue that there is a fourth way in which the scheme violates informational privacy: requiring incident reports to the medical licensing board that identify patients by name, without any requirement of non-disclosure by the licensing board, Ariz. Admin. Code R9-10-1504(B), (C). The district court held that the first two requirements violated informational privacy rights. We affirm, and also hold that the fourth requirement does not violate informational privacy rights.[3] Because we have held that the scheme's authorization of warrantless searches violates the Fourth Amendment, we need not reach the third claim of an informational privacy violation.
 
 
 77
 Individuals have a constitutionally protected interest in avoiding "disclosure of personal matters," including medical information. See Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). "Like the right to decide whether to terminate a pregnancy, the right to informational privacy is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." Lawall II, 307 F.3d at 790 (internal quotation marks omitted).
 
 
 78
 We balance the following factors to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest: (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access. Id.
 
 
 79
 In Lawall II, we held that the right to informational privacy "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." Id. at 789-90. Even if a law adequately protects against public disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information. If information that a woman has had an abortion is made available to all DHS employees, the fact that they are government employees is no solace to the numerous neighbors, relatives, and friends of DHS employees, as well as to the employees themselves.
 
 
 80
 
 a. DHS Employee Access to Records
 
 
 
 81
 Ariz. Admin. Code R9-10-1511(A)(4)(b), (c) requires providers to give DHS employees access to unredacted medical records.
 
 
 82
 The type of information that may be requested under the regulation is extremely broad, and includes patient identifying information such as names and full medical histories. Defendants maintain that DHS could only review and copy patient records as part of sampling them during a licensing survey or as part of a complaint investigation, but these limits are still very broad, especially as the scheme permits anonymous complaints. Moreover, while statutes giving DHS access to records limit the purpose for which access can be sought, the challenged regulation has no such limitations on its face.
 
 
 83
 The potential for harm in any subsequent non-consensual disclosure is obviously tremendous, and defendants do not dispute this, yet the safeguards to prevent unauthorized disclosure to members of the public are inadequate. Although the act prohibits DHS from publicly releasing specific, identifiable patient information, Ariz.Rev.Stat. §§ 36-449.03(I), 36-2301.02(G), it is unclear whether the statute provides for any criminal or civil penalties for such disclosure by DHS employees. Cf. Lawall II, 307 F.3d at 787 (noting the criminalization of an employee's disclosure of information); see also Whalen, 429 U.S. at 594-95, 97 S.Ct. 869 (same). The civil and criminal penalties to which defendants cite, Ariz.Rev.Stat. §§ 36-431, 36-431.01, appear to refer primarily to the health providers, and may not apply to DHS employees. DHS argues that it trains its employees in the need for patient confidentiality, but the only evidence of such training it has submitted is vague deposition testimony by DHS personnel stating that certain employees are required to keep information confidential, and that some staff are trained in confidentiality, without explaining which employees are trained, whether those with primary access to the records are the ones trained in confidentiality, or what that training entails.
 
 
 84
 Furthermore, even if the safeguards against public disclosure were adequate, there are no safeguards at all against release of information to government employees who have no need for the information, as there were in Lawall II. In Whalen, access to the files was confined to a very limited number of health department and investigatory personnel: seventeen Department of Health employees and twenty-four investigators who only had access in cases of overdispensing investigations. 429 U.S. at 595, 97 S.Ct. 869. Also in Whalen, older files were kept in a locked vault, and the receiving room for the information was "surrounded by a locked wire fence and protected by an alarm system." Id. at 594, 97 S.Ct. 869.
 
 
 85
 Weighing even further against the medical record access is the fact that there is little, if any, need for much of this information, such as the names and addresses of patients. Defendants assert that they need access to patient identifying information because they need to ensure that providers are complying with the scheme's requirement that they document such information, but ensuring compliance with this administrative requirement is tenuously related to health interests, and DHS could ensure such compliance simply by checking whether the required fields are present in a patient's chart, even if the content of those fields were marked out. Other monitoring goals could easily be satisfied using a coding system to track records without the release of patient identifying information.
 
 
 86
 Finally, while the public interest involved — promoting health and safety — is of course a strong one, we fail to see how insisting on unredacted materials promotes this need. We therefore hold that the regulation giving DHS unbounded access to unredacted patient records violates the informational privacy rights of patients.
 
 
 87
 
 b. Release of Ultrasound Prints to APEX Employees
 
 
 
 88
 Ariz.Rev.Stat. § 36-2301.02(B), (C) requires licensees to submit ultrasound prints with patient identifying information on them to a private contractor, APEX, for review. DHS maintains that it "intends" to implement an anonymous coding system to eliminate the identifying information, but no binding policy exists yet in this regard.
 
 
 89
 The Scope of Work Solicitation describing APEX's contractual duties to DHS is alarmingly brief and lacking in safeguards to protect patients' private information. It requires APEX to store the prints for seven years, but only mandates even minimally secure storage for the first two years: "The storage will be secure, for at least two years that shall be in the Apex offices where there is always a person on duty." After the first two years the prints may be stored "off-site." No contractual terms limit the access of APEX employees, and there is no mandate that APEX employees with access be screened or trained in confidentiality procedures. Thus, a host of private APEX employees may presumably access the ultra-sound prints.
 
 
 90
 An analysis of section 36-2301.02(B), (C) under the five factors relevant to informational privacy burdens demonstrates that these statutory provisions violate informational privacy rights as well. The type of information requested is obviously very sensitive, and the potential for harm in any subsequent non-consensual disclosure is tremendous. However, the safeguards to prevent unauthorized disclosure are limited to a single provision, which simply states that "[p]ersonally identifiable patient information shall not be released by the department or its contractor," and as explained above, the contract between APEX and DHS does not demonstrate that there are any more adequate and specific safeguards. While the need for access is high if the State is to stringently enforce the express statutory mandate that ultrasounds be taken after twelve weeks, the need for ultrasound prints to be trackable to the patient level is hard to fathom. Moreover, there is clearly no need for all APEX employees to have this sort of access in order to enforce the ultrasound requirement.
 
 
 91
 Because an assessment of these five factors indicates that section 36-2301.02(B), (C) violates patients' information privacy rights and is unconstitutional, we affirm the district court's grant of summary judgment to plaintiffs on this claim.
 
 
 92
 
 c. Release of Patient Identifying Information to the Licensing Board After an "Incident"
 
 
 
 93
 Ariz. Admin. Code R9-10-1504(B), (C) requires licensees to release information, including the name of a patient, to a professional licensing board if there is an "incident" with the patient. An incident is defined as "an abortion related patient death or serious injury to a patient or viable fetus." Id. R9-10-1501(20). Plaintiffs do not appear to have raised this informational privacy claim below. We normally do not reach claims raised for the first time on appeal, but we may exercise discretion to do so where manifest injustice would otherwise result. Alexopulos by Alexopulos v. Riles, 784 F.2d 1408, 1411 (9th Cir.1986). Because the informational privacy rights of patients, who are not parties to the suit but are being represented by their physicians, are at issue, we exercise our discretion to reach this claim and prevent an invasion of their privacy rights.
 
 
 94
 Although professional licensing boards are not subject to the scheme's prohibitions on information disclosure, Ariz.Rev.Stat. §§ 36-449.03(I), 36-2301.02(G) (stating that the department and its contractor will not release patient identifying information), other established safeguards prohibit release of patient information to the public when any incident is reported to either the Arizona Medical Board or the Board of Osteopathic Examiners in Medicine and Surgery. Ariz.Rev.Stat. §§ 32-1451.01(C), 32-1855.03(D).
 
 
 95
 Assessing this regulation under the required five factors, we find that the type of information requested is narrow (a description of the incident, the name of the patient involved, and any follow up actions taken), and it is only requested when there is death or serious injury involved. Moreover, the potential for harm in any subsequent non-consensual disclosure is minimized by the existing safeguards to prevent unauthorized disclosure. We recognize that the state interest in having the professional physician licensing board follow up on serious incidents is strong, so that substandard physician practice can be disciplined, and that there is an express statutory mandate militating toward access. Therefore, we hold that Ariz. Admin. Code R9-10-1504(C) does not violate patients' informational privacy rights and is constitutional.
 
 VII. Unconstitutionally Vague Provisions
 
 96
 The Fourteenth Amendment is violated by laws so vague that persons "of common intelligence must necessarily guess at their meaning and differ as to their application." Planned Parenthood v. Arizona, 718 F.2d 938, 947 (9th Cir.1983); see also Forbes v. Napolitano, 236 F.3d 1009, 1011 (9th Cir.2000). A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, id. (citing Giaccio v. Pennsylvania, 382 U.S. 399, 402-03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)), or is so indefinite as to allow arbitrary and discriminatory enforcement, id. (citing City of Chicago v. Morales, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)). On the other hand, "we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
 
 
 97
 Given the potential for harassment of abortion providers, it is particularly important that enforcement of any unconstitutionally vague provisions of the scheme be enjoined. See Women's Med. Ctr., 248 F.3d at 422 (making a similar point). Also, "[i]f a statute subjects transgressors to criminal penalties, as this one does, vagueness review is even more exacting." Forbes, 236 F.3d at 1011.
 
 
 98
 The district found unconstitutionally vague a provision of the statutory scheme requiring a licensee to "ensure that a patient is afforded the following rights, and is informed of these rights: [ ] To be treated with consideration, respect, and full recognition of the patient's dignity and individuality." Ariz. Admin. Code R9-10-1507. We affirm the district court's holding that this provision is unconstitutionally vague.
 
 
 99
 In Women's Med. Ctr. of N.W. Houston, the Fifth Circuit struck down a similar provision because it subjected "physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others." 248 F.3d at 422. In Forbes, this circuit struck down as unconstitutional provisions including the ambiguous words "experimentation," "investigation," and "routine." 236 F.3d at 1010. Forbes found these words, which were not defined in the statute, ambiguous, especially in view of the fact that the "distinction between experimentation and treatment changes over time." Id. at 1012.
 
 
 100
 Similarly here, understandings of what "consideration," "respect," "dignity," and "individuality" mean are widely variable, and they are not medical terms of art. This is especially problematic since the provision requires "full recognition" of dignity and individuality. This provision is too vague and subjective for providers to know how they should behave in order to comply, as well as too vague to limit arbitrary enforcement. Thus, we agree with the district court that it is unconstitutionally vague and cannot be enforced. By failing to brief them, plaintiffs have abandoned their vagueness challenges to other parts of the statute, so we do not reach these claims. See Kline v. Johns-Manville, 745 F.2d 1217, 1221 (9th Cir.1984).
 
 VIII. Unconstitutional Delegation
 
 101
 The regulatory scheme requires that when abortions are performed in an abortion clinic, a physician with admitting privileges at a hospital in Arizona be present until all patients are stable and ready to leave the recovery room. Ariz. Admin. Code R9-10-1506(B)(2). Although this regulation does not formally require physicians to have admitting privileges in order to perform abortions, it has the effect of requiring them for physicians at all but the largest clinics because it requires someone with admitting privileges to be physically present in an abortion clinic when the abortion is performed. Plaintiffs challenge the regulation as an unconstitutional delegation of authority to private hospital boards.
 
 
 102
 
 a. Procedural Due Process
 
 
 
 103
 When a State delegates its licensing authority to a third party, the delegated authority must satisfy the requirements of due process. See Wash. ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22, 49 S.Ct. 50, 73 L.Ed. 210 (1928) ("The section purports to give the owners ... authority — uncontrolled by any standard or rule prescribed by legislative action.... They are ... free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. The delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment.") (citation omitted); see also Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).
 
 
 104
 Arizona law requires hospitals to refrain from arbitrary provision of admitting privileges and requires them to exercise their discretion based on reasons related to the hospital's interests. See Holmes v. Hoemako Hosp., 117 Ariz. 403, 573 P.2d 477, 479 (1978) (explaining that "the standard for determining whether a hospital regulation [is] reasonable or arbitrary" is whether it "pertain[s] to the orderly management of the hospital" and whether "in most instances [it was] made for the protection of patients") (internal quotation marks omitted). Arizona law also requires hospital procedures to "comport with due process, i.e., notice and hearing." Id. However, judicial review of exclusionary hospital policies "must be narrow." Id. at 478. "If the hospital has refused staff privileges on the basis of factual findings supported by substantial evidence and reached its decision by the application of a reasonable standard, i.e., one that comports with the legitimate goals of the hospital and the rights of the individual and the public, then the judicial inquiry should end." Peterson v. Tucson Gen. Hosp., Inc., 114 Ariz. 66, 559 P.2d 186, 191 (App.1976) (citing Blende v. Maricopa County Med. Soc'y, 96 Ariz. 240, 393 P.2d 926 (1964)).
 
 
 105
 Given the Arizona caselaw cited above, we agree that Arizona law prohibits hospitals from violating procedural due process, and therefore, the delegation scheme does not violate physicians' procedural due process rights. See Douglas v. Noble, 261 U.S. 165, 168-69, 43 S.Ct. 303, 67 L.Ed. 590 (1923) (upholding a delegation of licensing authority to a licensing board because the highest court of the State had provided for judicial review and construed the statute to not confer arbitrary power on the board).
 
 
 106
 
 b. Substantive Due Process
 
 
 
 107
 However, although judicial review of hospital regulations in Arizona stems from their "quasigovernmental" nature, Blende, 393 P.2d at 929, Arizona law does allocate to hospitals the authority to make substantive exclusions in the hospital's interest. E.g., Peterson, 559 P.2d at 191 (allowing exclusions based on rules that "comport[ ] with the legitimate goals of the hospital and the rights of the individual and the public"). Moreover, Arizona explicitly gives all hospitals the right to refuse to allow abortions to be performed at the hospital, Ariz.Rev.Stat. § 36-2151, and has prohibited all abortions in public university hospitals except those necessary to save the life of the woman having the abortion, Ariz.Rev.Stat. § 15-1630.
 
 
 108
 Arizona itself does not have the power to prohibit any providers from performing abortions merely because it disapproves of abortion and would like to place obstacles in the way of women seeking abortions. Casey, 505 U.S. at 877, 112 S.Ct. 2791 (holding that laws with the "purpose" of placing an obstacle in the path of a woman seeking an abortion are invalid). Thus, Arizona may not delegate such a power to hospitals. See Hallmark Clinic v. N.C. Dep't of Human Res., 380 F.Supp. 1153, 1158-59 (E.D.N.C.1974) ("The state cannot grant hospitals power it does not have itself."), affirmed on other grounds, 519 F.2d 1315 (4th Cir.1975).
 
 
 109
 Because this is a facial constitutional challenge, plaintiffs must show that there are no circumstances under which the delegation could be applied constitutionally. Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Plaintiffs have not submitted any evidence tending to show that any hospitals in Arizona will or do deny admitting privileges to physicians based on their status as abortion providers, or based on any other policies seeking to restrict the right to abortion. Nor has it been shown that this would be legal under Arizona law. Since they have submitted no evidence that any hospitals will exercise the authority delegated to them by Arizona in an unconstitutional manner, plaintiffs cannot show on this record that there is "no set of circumstances" in which the delegation will be constitutional, and we affirm the district court's grant of summary judgment to defendants on this facial challenge.
 
 IX. Severability
 
 110
 Plaintiffs challenge the severability of the unconstitutional portions of the scheme from the constitutional portions of the scheme. Severability is an issue of state law. Dep't of Treas. v. Fabe, 508 U.S. 491, 509 n. 8, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Because we remand to the district court on plaintiffs' undue burden claim, we will not address the question of severability, since it is not yet clear if further portions of the scheme are unconstitutional.
 
 CONCLUSION
 
 111
 We reverse the district court's grant of summary judgment to defendants on plaintiffs' undue burden claim. We affirm the district court's grant of summary judgment to defendants on the equal protection claims and the standardless delegation claim. We affirm the grant of summary judgment to plaintiffs on their Fourth Amendment and informational privacy claims. We also affirm the partial grant of summary judgment to plaintiffs on their vagueness claims, and the partial grant of summary judgment to defendants on these claims. We remand to the district court for further proceedings on the undue burden claim. Each party shall bear its own costs on appeal.
 
 
 112
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Some of the evidence of record in this case is contested, as plaintiffs made two motions in district court to strike numerous factual statements and submissions of evidence by defendants. They state that they are appealing "the denial of those motions to the extent that the inadmissible evidence submitted by defendants is relied upon by defendants to support the district court's grant of partial summary judgment to defendants." The district court below stated it would only rule on the motions to the extent necessary to rule on the summary judgment motions. It then never addressed the merits of the motions, presumably because it did not rely on any of the contested evidence or factual statements. We also have no need to rely on any contested evidence, and do not cite any of it here. We therefore do not reach the question of how the district court should rule on these motions on remand
 
 
 [2]
 The Senate fact sheet's Background section on the scheme at issue begins with the following description:
 Events in 1998 at a Phoenix abortion clinic raised several questions about the responsibility of state agencies to ensure the public health and safety regarding abortion and other outpatient medical procedures. House Bill 2152 was introduced in 1998 to establish regulation of abortion clinics, but was held in committee primarily due to concerns that the regulations infringed on the rights of and would have a negative fiscal impact on doctors in private practice.... Currently there are ten states that regulate abortion clinics through separate licensure classification procedures. There are less than 20 abortion clinics in Arizona, about half of which are already licensed through the Department of Health Services (DHS). The proposed legislation would require the remaining clinics to become licensed. It would also require DHS to adopt rules for licensure and medical emergency measures. According to the Joint Legislative Study Committee, the three main issues are establishing the gestational age of the fetus, codifying the standards for obstetric gynecologic services, and monitoring compliance without infringing upon constitutional rights to practice.
 The House Abstract contains similar language.
 Some doctors in deposition testimony indicated that they felt Lou Anne Herron's death was merely an "excuse" for the law, which anti-abortion proponents had wanted for a long time. In light of the legislative history, however, plaintiffs must submit something more than the suspicion of doctors that there is an illegitimate purpose to the scheme.
 The president of Planned Parenthood Central and Northern Arizona indicated that they had been promised the law would not single out abortion, and would apply to all comparable medical procedures, but had been betrayed, after cooperating to some extent with drafting. However, that the purpose of the Joint Committee was narrowed from investigating regulation of all outpatient medical services solely to abortion clinics cannot establish an illegitimate purpose to subordinate those clinics and their providers. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."). Thus, this testimony is not sufficient to create a material issue of fact regarding animus in light of the legislative history.
 Finally, Bryan Howard of Planned Parenthood, who participated in the drafting of the legislation and worked with the legislative committee, indicated in deposition testimony that the purpose of the provision requiring hospital admitting privileges "has nothing to do with women's health." Howard indicated that Susan Gerard, "the representative who inserted it in the bill," did so because of a concern that "BOMEX [Arizona's physician licensing board] ... was not strong enough in its oversight of physicians, and that hospital credentialing processes ... [were] actually more stringent than BOMEX was; ... It was a roundabout way of addressing the perception that BOMEX was too weak." But even when we make all inferences in favor of the plaintiffs, this cannot be understood as an attempt to limit the number of abortion providers based on bare animus, but rather a somewhat blunt attempt to limit the number based on qualifications and credentials.
 
 
 [3]
 For the reasons set forth,infra, we exercise our discretion to reach this claim raised for the first time on appeal.